Westlaw.

Not Reported in F.Supp.2d                                                                                              Page 1

Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
(Cite as: 2002 WL 109615 (E.D.Pa.))

▷

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
Stephanie SUSAVAGE and Scott Susavage,
Administrators of the Estate of Cynthia
Susavage.
v.
BUCKS COUNTY SCHOOLS INTERMEDIATE
UNIT NO. 22, et al.
No. CIV.A. 00-6217.

Jan. 22, 2002.

*MEMORANDUM*

GILES, C.J.

*I. INTRODUCTION*

*1 Alleging violations of federal constitutional and statutory rights, plaintiffs filed this action on December 8, 2000 as Administrators of the Estate of Cynthia Susavage, a minor, and in their own right, as parents, seeking compensatory and punitive damages against the Bucks County Schools Intermediate Unit No. 22 ("BCIU"), the Quakertown Community School District ("School District") and the LifePath Special Care Facility ("LifePath"). On February 12, 2001, the school district filed a third party action against the Levy Bus Co. ("Levy"), whose bus was transporting the minor child to school when she sustained injuries that led to her death.

Plaintiffs assert violations of the decedent's rights under the Fourteenth Amendment, 28 U.S.C. § 1983, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et. seq.*, § 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.* They also assert conspiracy to violate civil rights under 42 U.S.C. § 1985.

Before the court is BCIU's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) or, in the alternative, for a more definite statement pursuant to Fed.R.Civ.P. 9(a) and 10(b). For the reasons that follow, the motion to dismiss is granted in part and denied in part. The motion for a more definite statement is denied.

*II. FACTUAL BACKGROUND*

Consistent with the review standards applicable to a motion to dismiss, Fed.R.Civ.P. 12(b)(6), the alleged facts, viewed in the light most favorable to the plaintiffs, follow. Plaintiffs Stephanie and Scott Susavage are the Administrators of the Estate of Cynthia Susavage, their minor school-age daughter who died on September 25, 1999 as a result of strangulation on her way to school riding on a Levy bus. BCIU is a political subdivision, an entity created by the Commonwealth of Pennsylvania to provide services to several school districts, including Quakertown, the school district covering the decedent's home area. LifePath is a private school which offers an early intervention program for children with special needs. The decedent was a special needs child who had a generalized seizure disorder and related musculo-skeletal problems which rendered her unable to sit upright independently. Third party defendant Levy is a private school bus company which was under contract with the school district. Plaintiffs allege that defendants provided, and caused to be applied, an improper harness-type restraint for their daughter's bus transportation which seriously injured her and ultimately led to her death on September 25, 1999.

In 1998, the decedent, Cynthia Susavage was evaluated by BCIU and deemed eligible to attend the Children's Developmental Program in Quakertown. The Developmental Program, in turn,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 2

Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177

**(Cite as: 2002 WL 109615 (E.D.Pa.))**

evaluated her and reported to BCIU that she needed adequate seating for fine motor stability. The program concluded that an Individual Education Plan ("IEP") must be developed. An IEP conference took place in April 1998. It included the parents as well as representatives from BCIU and the Children's Developmental Program. In June 1998, the Children's Developmental Program and LifePath reported to BCIU, through an Adaptive Behavior Scale Evaluation, that the child could not ride independently on a bus and could not travel unattended to and from school. BCIU then sent a Special Transportation Request to the school district's Special Education Transportation Department. Around the same time, LifePath sent a letter to BCIU stating that "for safety reasons" Cynthia needed a "one-on-one assistant" during bus transportation.

In July 1998, Cynthia became enrolled in the Early Intervention Services Program at LifePath. Pursuant to a contract with the school district, Levy transported the child to and from the school. As of July 1998, LifePath's progress notes show that the child's equipment needs were a primary problem. This included recognition of her need for a special car seat which had to be ordered. Plaintiffs allege that they pleaded with defendants to provide the special car seat or alternatively, until the seat was available, one-on-one supervision of their child during her bus transport. In November 1998, a LifePath Early Intervention Program Change of Status Report was sent to BCIU reiterating that the child required special equipment to maintain postural alignment for safe transportation to and from school.

*2 In December 1998, LifePath sent an accident report to BCIU advising that the child had fallen over and had hit her nose on the floor. On December 10, 1998, a Levy bus driver made a written report that the child had been put in a seat belt on the bus but that the seatbelt did not secure her properly since she was unable to stay in a sitting position. On the same day, Levy was advised by Dr. James Newcomer of the school district, that there were three options: 1) put an aide on the bus to ride with Cynthia; 2) get a special car seat for her to ride in; or 3) put a harness on her to keep her in her bus seat.

Plaintiffs allege that Dr. Newcomer decided to try the harness and suggested to Al Rosenberger of Levy that he speak with Marcy Woods of BCIU about how to obtain parental approval. Mr. Rosenberger contacted Ms. Woods, who voiced no objection to the use of the harness. Levy also contacted LifePath and spoke with its Director, Mary Ann Davis, who similarly voiced no objection. A Mr. Jones of Levy then went to the Susavage home with three different harnesses belonging to BCIU. After consulting with Cynthia's father, a harness was selected for use on the bus. [FN1]

> FN1. It appears from the pleadings and from oral argument that the harnesses belonged to BCIU but were in the possession of Levy, which had previously used them on other children who had needed seat support.

The next day, December 11, 1998, Levy's driver attached the harness to Cynthia on the bus in preparation for the trip to LifePath and then proceeded to the school. The BCIU harness used on Cynthia was a four-point harness which, unlike a five-point harness, lacks a strap restraint that goes between the legs of a small child to prevent her from sliding downward in her seat. The part of the harness designed to go across the child's chest could come into contact with the chin or throat of a child who could not prevent herself from sliding downward. In addition, however, the harness was put on Cynthia backwards with the top of its zipper against the front of Cynthia's throat. Only two of the four points were secured and these were secured with straps from other harnesses. Unsupervised, she traveled approximately twenty minutes to school. During that time, she became strangulated by the harness. When discovered, she was unconscious. She was promptly hospitalized and was treated for hypoxic ischemic encephalopathy secondary to the strangulation. She lingered in a coma until September 25, 1999.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 3
Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
(Cite as: 2002 WL 109615 (E.D.Pa.))

### III. DISCUSSION

*3 Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate only if, accepting the well-pled allegations of the complaint as true, and drawing all reasonable inferences in the light most favorable to plaintiff, it appears that a plaintiff could prove no set of facts that would entitle it to relief. See H.J. Inc. v. Northwest Bell Tel. Co., 492 U.S. 229, 249, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); Weiner v. Quaker Oats Co., 129 F.3d 310, 318 (3d Cir.1997); Unger v. National Residence Matching Program, 928 F.2d 1392, 1394-95 (3d Cir.1990).

### A. Immunity under the PA Political Subdivision Tort Claims Act

BCIU argues that the various wrongful acts and omissions alleged in the complaint do not constitute violations of federal constitutional or statutory rights and that plaintiffs seek to avoid the bar of municipal immunity that exists under the Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8541 et seq., ("PSTCA"), by cloaking state law wrongful death, negligence and products liability claims as a federal civil rights case. The PSTCA states, inter alia, "Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of an injury to a person or property caused by an act of the local agency or an employee thereof or any other person." 42 Pa.C.S.A. § 8541. The court disagrees.

The court finds, infra, that the facts as pled are sufficient to state a cause of action under § 1983. Moreover, Section 2000d-7 of the United States Code abrogates immunity for violations of § 504 and any other federal statute prohibiting discrimination by recipients of federal financial assistance. 42 U.S.C. § 2000d-7 (1999). BCIU is such a recipient. Similarly, pursuant to 28 C.F.R. Section 35.178, state and local agencies "shall not be immune ... from an action in Federal or State court of competent jurisdiction for a violation of [the ADA]." 28 C.F.R. § 35.178; see Jeremy H. by Hunter v. Mt. Lebanon Sch. Dist., 95 F.3d 272 (3d Cir.1996); Helen L. v. DiDario, 46 F.3d 325 (3d Cir.1995).

### B. The Section 1983 Claim As Expression of Violation of Due Process Rights

#### 1. Respondeat Superior

Initially, BCIU argues that under § 1983, a municipality cannot be held liable for the independent acts of its employees under the doctrine of respondeat superior. The United States Supreme Court has rejected the concept of municipal liability flowing from injuries inflicted solely by a municipality's employees or agents. Jett v. Dallas Independent School District, 491 U.S. 701, 710, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); Monell v. Department of Social Services, 436 U.S. 658, 692-93, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1977). BCIU argues that plaintiffs seek to impose vicarious liability upon BCIU for the negligence of Levy in allegedly failing to transport the decedent safely and for the negligent acts of Ms. Woods of BCIU who consented to the use of the harness.

A review of the complaint shows, however, that plaintiffs have not alleged municipal liability on the basis of respondeat superior; rather, as discussed infra, they have alleged specific violations by BCIU cognizable under § 1983.

#### 2. Deliberate Indifference Standard

*4 BCIU argues that the appropriate liability standard for federal due process violations is "shock the conscience" rather than "deliberate indifference." In County of Sacramento v. Lewis, 523 U.S. 833, 846-47, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Supreme Court held that a plaintiff seeking to establish a constitutional violation must demonstrate that the official's conduct "shocks the conscience" in the particular setting in which that conduct occurred. The Court explained that "[t]he exact degree of wrongfulness necessary to reach the 'conscience shocking' level depends upon the circumstances of a particular case." Id. Following Lewis, in Miller v. City of Philadelphia, 174 F.3d 368 (3d Cir.1999), the third circuit delineated what Lewis referred to as the "culpability spectrum." Leddy v. Township of Lower Merion, 114 F.Supp.2d 372 (E.D.Pa.2000) (citing Miller, 174

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                               Page 4

Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177

**(Cite as: 2002 WL 109615 (E.D.Pa.))**

F.3d at 375; *Lewis*, 523 U.S. at 849). *Miller* held that a higher degree of culpability is required in "hyperpressurized situations" while a lesser degree of culpability may suffice in situations where the actor is able "to proceed in a deliberate fashion." *Nicini v. Morra*, 212 F.3d 798, 810-11 (3d Cir.2000) (*en banc*) (citing *Miller*, 174 F.3d at 375 and applying "deliberate indifference" standard in a substantive due process action under § 1983 involving an abused foster child). Where the state actor has time to "make unhurried judgments," conduct which is deliberately indifferent will shock the conscience. *Id.* Because here, as in *Nicini*, BCIU had time to make unhurried judgments to insure Cynthia's safety, deliberately indifferent conduct, if it existed, could shock the conscience. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir.1996) (noting that the "deliberate indifference" standard is consistent with the Supreme Court's construction of municipal liability under 42 U.S.C. § 1983).

*a. First Theory: Policy, Practice or Custom*

BCIU argues that plaintiffs do not state a cause of action under § 1983 because they cannot prove that BCIU had a policy, practice or custom of supplying defective harnesses for use with medically fragile children or of casting a "blind eye" toward negligence by BCIU employees.

Plaintiffs have identified two practices of BCIU, the implementation of which arguably resulted in constitutional injury. Specifically, they state: 1) BCIU delegated its statutory responsibility for the transportation of disabled children to private entities like Levy without instructions for safe transportation; and 2) BCIU owned and distributed the defective harness that caused Cynthia's death and had previously distributed to Levy identical or substantially similar harnesses for use upon similarly disabled children without instructions or training on the correct use or non-use of such devices.

*5 Under *Monell*, a municipality can only be liable when the alleged constitutional violation implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. 436 U.S. at 658. "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir.1996) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion)). Customs are " 'practices of state officials ... so permanent and well settled' as to virtually constitute law." *Id.* (quoting *Monell*, 436 U.S. at 691). "Custom ... may also be established by evidence of knowledge and acquiescence." *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir.1989), *cert. denied*, 492 U.S. 919, 109 (1989). In addition, the responsible decisionmaker need not be "specifically identified by the plaintiff's evidence" and "[p]ractices 'so permanent and well settled' as to have 'the force of law' [are] ascribable to municipal decisionmakers." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990) (citing *Anela v. City of Wildwood*, 790 F.2d 1063, 1067 (3d Cir.1986) (quoting *Monell*, 436 U.S. at 691)).

For the purpose of establishing that the alleged practices of 1) delegating its statutory duty to transport disabled children without instructions regarding their safe transportation; and, 2) distributing defective harnesses for use with disabled children without adequate training, were "customs" of BCIU, plaintiffs allege that BCIU had actual or constructive knowledge of special safety needs that could not be met by use of the harness, through experience with Cynthia and other children. Specifically, they state that in early 1998 the Children's Developmental Program sent BCIU a report instructing that Cynthia needed special seating on the bus for fine motor stability. BCIU representatives were present at the IEP conference in April 1998 and therefore knew at that time that adequate provisions for Cynthia's transportation had not been made. In June 1998, the Children's Developmental Program and LifePath together sent BCIU an Adaptive Behavior Scale Evaluation again stating that Cynthia could not ride independently and unattended on a school bus to and from school. Despite this knowledge, no special provision was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 5

Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
(Cite as: 2002 WL 109615 (E.D.Pa.))

made for Cynthia's protection before she was turned over to Levy for transportation to the LifePath school in July 1998. LifePath sent additional communications thereafter to BCIU regarding its concerns about Cynthia's bus transportation safety.

Plaintiffs further assert, in support of their argument that BCIU had a practice of distributing harnesses that were inappropriate and unsafe for use with disabled children without instructions for the correct use of the devices, that BCIU had previously provided such harnesses for use with other medically fragile children; that three of the BCIU harnesses were in the possession of Levy; and, that BCIU employee Ms. Woods approved the use of one of the harnesses in Levy's possession for use upon Cynthia.

*6 Because BCIU is a political subdivision created by law for the specific purpose of providing services to multiple school districts, the procedure for providing these services reasonably could be found to be the product of a BCIU decision maker's action or acquiescence. See Berg v. County of Allegheny, 219 F.3d 261 (3d Cir.2000). Likewise, a reasonable jury could find that BCIU's practice of delegating to a private entity its federal statutory duty of transporting disabled children safely was the decision of a BCIU policymaker or the result of acquiescence. Having chosen to delegate such a responsibility, BCIU could be found to know the fitness and general methods of the contractor fulfilling the delegated duty.

BCIU further asserts that even if such knowledge existed, plaintiffs cannot prove that BCIU was aware of any potential danger to the decedent, inasmuch as Levy was responsible for the day-to-day transport of school children and any potential danger from use of the harness would have been obvious only to Levy.

Once a § 1983 plaintiff has identified a municipal policy or custom, it must then "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). If the policy or custom does not facially violate federal law, causation can be established by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." Berg, 219 F.3d at 276 (citing Bryan County, 520 U.S. at 407). "The term 'deliberate indifference' is generally defined to require ... knowledge of a serious risk of harm," Id. (citing Fuentes v. Wagner, 206 F.3d 335, 345 n. 12 (3d Cir.2000)), and "implies a failure to take reasonably available measures to reduce or eliminate that risk." Id. (citing Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

A reasonable jury could find that the various written reports and other communications received by BCIU regarding Cynthia's existing unsafe transportation evidenced specific knowledge of the danger of serious injury to the child that would be posed by the use of any seat restraint system that had not been proven to be safe for the special circumstances presented. See Beck, 89 F.3d at 973.

A reasonable jury could also find that in light of BCIU's actual knowledge of the special risk to Cynthia that was presented by her condition, its failure to require that only a proven safe method of transport be utilized could be characterized as deliberately indifferent to the statutory duty of providing safe transportation to the child. Although BCIU asserts that it was Levy's negligence that caused the injury, a jury could find that BCIU left Levy to devise a means of restraint, knowing that Levy was not qualified to design and implement a safe restraint system for this disabled child.

b. Second Theory: Failure to Train

*7 BCIU argues that it cannot be held liable on a failure to train theory because 1) plaintiffs have not identified any specific training that BCIU failed to employ; 2) there is no nexus between inadequate training and the injuries suffered by the minor plaintiff; and, 3) there are no facts suggesting that any lack of training constituted deliberate indifference. Plaintiffs have alleged that BCIU failed to provide training on how to select, apply

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00920-KAJ   Document 43-8   Filed 03/14/2006   Page 6 of 19

Not Reported in F.Supp.2d                                                                                              Page 6
Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
(Cite as: 2002 WL 109615 (E.D.Pa.))

and secure appropriate harnesses and other equipment to Cynthia and other medically fragile children for purposes of safe bus transportation. Because there is no evidence of a pattern of injuries to other children, however, the court will address only whether BCIU can be held liable for failing to train Levy to provide safe transportation to Cynthia Susavage.

The third circuit has held that the inadequacy of training may itself serve as the basis for liability where it amounts to "deliberate indifference." *See Reitz v. County of Bucks,* 125 F.3d 139, 145 (3d Cir.1997). "[T]o make out a claim of deliberate indifference based on direct liability (i.e., insofar as the defendants are alleged to have known of and ignored [a] particular risk ... ), the plaintiffs must ... show that the defendants knew or were aware of and disregarded an excessive risk to the plaintiffs' health or safety, and they can show this by establishing that the risk was obvious." *Beers-Capitol v. Whetzel,* 256 F.3d 120, 135 (3d Cir.2001). The standard is high and while deliberate indifference in a situation involving a "pattern of such injuries" requires evidence that "the defendant should have recognized the risk and responded to it," deliberate indifference to a particular risk requires a showing that the defendant knew or "*must* have recognized" the risk. *Id.* at 138 (emphasis added). The "*Sample* test" requires a risk of harm "so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it." *Id.* at 134 (quoting *Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir.1989) (citing *City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989))).

Here, while Levy may not have needed training in steering a bus on a roadway, it would be reasonable to infer that BCIU knew or must have known, given Cynthia's special needs and the numerous communications regarding her safety, that Levy needed special training and supervision to insure her safe transport. This is especially true because BCIU knew that Cynthia required a seat restraint system tailored to her particular needs and that this had not yet been obtained. *See Beers-Capitol,* 256 F.3d at 140 (citing *Hamilton v. Leavy,* 117 F.3d 742 (3d Cir.1997) (deliberate indifference shown by prison official who failed to transfer prisoner after receiving recommendation that prisoner be placed in protective custody because of his risk of being attacked); *Spruce v. Sargent,* 149 F.3d 783 (8th Cir.1998) (deliberate indifference shown by prison official where plaintiff-prisoner presented documents signed by that defendant which contained numerous references to sexual attacks the plaintiff was suffering)). Levy was neither a manufacturer nor a designer of safety restraints for the disabled and a reasonable jury could find that the need for training in the proper application of any special restraint device provided to a non-expert for use on a disabled child was obvious.

*8 Moreover, one can infer actual or constructive knowledge from the existence of a statutory training requirement. The third circuit has stated that the failure of school officials to perform duties set forth in federal and state statutory schemes governing the education of disabled students itself violates student's due process rights. *W.B. v. Matula,* 67 F.3d 484, 502 (3d Cir.1995). Explaining that the requirements of procedural due process are triggered when a protected liberty interest is at stake and that such interests may arise from either the Constitution or from a state statute or regulation, *Matula* held that the plaintiffs had alleged a deprivation of their child's right to a free, appropriate public education secured by IDEA and § 504 and cited *P.C. v. McLaughlin,* 913 F.2d 1033 (2d Cir.1990) for the proposition that allegations of federal statutory violations should be treated as allegations of procedural due process as a matter of law. *Id.* The court then held that the plaintiffs had sufficiently alleged that their child had been deprived of due process when 1) the defendants failed to provide written notice before evaluating the child; and, 2) the defendants failed to provide § 504 services for eight months after they agreed that the child was eligible for them. *Matula,* 67 F.3d at 502. These claims were treated as separate from the IDEA and § 504 claims under § 1983 even though they alleged the same violations. *Id.* Thus it is permissible to use the existence of certain statutory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 7
Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
**(Cite as: 2002 WL 109615 (E.D.Pa.))**

provisions in the course of due process analysis.

Here, the relevant provisions of IDEA define "assistive technology service[s]" as, *inter alia,* "selecting, designing, fitting, customizing, adapting, applying, maintaining, repairing, or replacing of assistive technology devices," 20 U.S.C. § 1401(26)(C), as well as "training or technical assistance for professionals ... or other individuals who provide services to ... or are otherwise substantially involved in the major life functions of individuals with disabilities." 20 U.S.C. § 1401(26)(F). A reasonable jury could find that BCIU had actual or constructive notice of the need for training based on the federal statutory requirement that it provide such training.

*9 If deliberate indifference by BCIU caused Levy to use a restraint that was not safe for use on Cynthia, the causal nexus with the injury suffered would be established.

*c. Third Theory: Special Custodial Relationship*

BCIU cites *D.R. by L.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364 (3d Cir.1992) (*en banc*) *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993) and *Black by Black v. Indiana Area School District,* 985 F.2d 707 (3d Cir.1993) for the proposition that claims of municipal liability based on the existence of a "special custodial relationship" must be rejected where the function performed by a private actor is not traditionally the exclusive prerogative of the state. It is a given that school bus transportation is not the exclusive prerogative of the state. Therefore, BCIU argues that Levy was not a state actor and delegation to Levy of a non-exclusive function cannot create liability for BCIU as a matter of law.

The "special custodial relationship" doctrine was recognized in *D.R.,* as an exception to the general rule that the state has no affirmative duty to protect citizens from private harm. *D.R.,* 972 F.2d at 1369; *see DeShaney v. Winnebago Co. Dept. of Soc. Services,* 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Under this doctrine, a state assumes such a duty when it takes physical custody of a person or otherwise prevents him from helping himself. [FN2] *D.R.,* 972 F.2d at 1370. The duty arises from "the limitations which [the state] has imposed on his freedom to act on his own behalf, through imprisonment, institutionalization, or other similar restraint of personal liberty," *DeShaney,* 489 U.S. at 190, and is breached where the state, "under sufficiently culpable circumstances, [fails] to protect the health and safety of the citizen." *D.R.,* 972 F.2d at 1369. Sufficiently culpable circumstances exist where the conduct in question is "deliberately indifferent." *Nicini v. Morra,* 212 F.3d 798 (3d Cir.2000).

> FN2. The *D.R.* court found that no special relationship existed between a public high school and its students who were being sexually molested by their classmates in restrooms because the students remained under the ultimate control of their parents and were at liberty to help themselves or to have their parents assist them.

In *Black,* 985 F.2d at 710-12, the third circuit found no special relationship between a school superintendent and female students who were sexually molested by a school bus driver. The court's holding was premised on findings that 1) the school district had not taken custody of the children or otherwise prevented them from helping themselves since parents could have made other transportation arrangements or escorted the children to school personally; and 2) school bus transportation was not a function "that has been 'traditionally the exclusive prerogative of the state' " and thus no relationship existed between the school district and the bus company such that the bus company's acts were "fairly attributable to the state." *Id.* (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). [FN3]

> FN3. *Black* also found untenable claims of liability premised on a policy, practice or custom theory, explaining that deliberate indifference could not be established since there was no evidence that the superintendent had failed to take

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 8
Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
(Cite as: 2002 WL 109615 (E.D.Pa.))

reasonable measures to address complaints of sexual abuse. 985 F.2d at 711-12 (distinguishing *Stoneking v. Bradford Area School District,* 882 F.2d 720, 725 (3d Cir.1989), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990) (finding principal and assistant principal of a high school were not entitled to qualified immunity from liability based on evidence that they followed a practice of "reckless indifference to instances of known or suspected sexual abuse of students by teachers").

*10 The above-cited portion of the *Black* opinion relied heavily upon *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), which had held that a private school and its superintendent were not state actors. There, the Court found that under Massachusetts law, all students with special needs were entitled to a suitable public education under the supervision of the state and local governments. *Rendell-Baker,* 457 U.S. at 832. Public school committees were subject to statutory requirements that special needs children be identified and that IEPs be prepared for them. *Id.* The Massachusetts statute provided that the committees could contract with private schools to implement educational programs. *Id.* These committees entered into contracts with a private school that specialized in dealing with students who had had difficulty completing public high school because of behavioral problems. *Id.* The Massachusetts Committee on Criminal Justice, a state entity responsible for distributing grant funds from the Federal Law Enforcement Assistance Administration, also entered into a contract with the private school to fund a vocational counselor. When the private school discharged several teachers and the counselor, those individuals brought suit under § 1983. *Id.* at 834-35.

The Supreme Court explained that the acts of private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts. *Id.* at 831. While acknowledging that "[t]here can be no doubt that the education of maladjusted high school students is a public function," the Court held that "the policy choice of Massachusetts to provide educational services ... at public expense 'in no way [made] these services the exclusive province of the State.' " *Id.* at 842. Extensive regulation by the state made no difference, for the purpose of establishing state action through the private contractor, because the conduct at issue was "not compelled or even influenced by any state regulation." *Id.*

However, the fact that a private entity performs a vital public function coupled with other factors demonstrating a close connection with the State, may justify a finding of state action in certain circumstances, *Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), and the question of whether a sufficient connection exists "can be determined only in the framework of the peculiar facts or circumstances present." *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 726, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

*11 While under the Massachusetts statute in *Rendell-Baker* the state had relatively little involvement in the personnel matters at issue, 457 U.S. at 830, and the federal grant program gave the state entity "the power only initially to review the qualifications of a counselor," *id.* at 838, here, federal statutory law mandated ongoing involvement and oversight by BCIU. The commentary to the implementing regulations for Title II of the ADA explains that "[a]ll governmental activities of public entities are covered, even if they are carried out by contractors. For example, a State is obligated by Title II to ensure that the services, programs, and activities of a State park inn operated under contract by a private entity are in compliance with Title II's requirements." 28 C.F.R., pt. 35, app. A (commentary § 35.102). The same is true under § 504 since Title II merely extends the protections of § 504 to all programs, activities, and services of state or local governments regardless of the receipt of federal funds. 42 U.S.C. §§ 12131-12165. Similarly, while IDEA expressly contemplates that children will be "placed in ... [private] schools or facilities by the State or appropriate local educational agency as the means of complying with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 9
Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
(Cite as: 2002 WL 109615 (E.D.Pa.))

the statute, ... with respect to such children, the statute obligates the 'State'--not the private school--to 'ensure' that such children are provided special education and related services, in accordance with an individualized education program." *St. Johnsbury Academy v. D.H.,* 240 F.3d 163, 171 (2d Cir.2001) (citing 20 U.S.C. § 1412); *see also* 34 C.F.R. §§ 300.400, 300.401. Thus, state and local educational agencies may be held liable under IDEA for the failure to provide a free appropriate public education. *Ullmo ex rel. Ullmo v. Gilmour Academy,* 273 F.3d 671, 679 (6th Cir.2001); *St. Tammany Parish Sch. Bd. v. Louisiana,* 142 F.3d 776, 784 (5th Cir.1998); *Gadsby v. Grasmick,* 109 F.3d 940, 955 (4th Cir.1997). Even where, at the discretion of the public agency, a private school conducts meetings and revises an IEP, "responsibility for compliance with [IDEA] remains with the public [agency]," *McKenzie v. Smith,* 771 F.2d 1527, 1531 (D.C.Cir.1985) (quoting 34 C.F.R. § 300.347 (1985) ; *accord* 34 C.F.R. § 300.349(c) (2000)), and IDEA defines a "public agency," to include the "political subdivisions of the State that are responsible for providing education to children with disabilities." *See St. Johnsbury Academy,* 240 F.3d at 171.

Thus, while extensive regulation unrelated to the personnel matter at issue in *Rendell-Baker* was not sufficient for a finding of state action, the federal regulations here were put in place precisely to "insure that a public agency that would otherwise be responsible for the education of a handicapped child [did] not abdicate that responsibility" merely by delegating it to a private entity. *Fuhrmann v. East Hanover Bd. of Educ.,* 993 F.2d 1031, 1037 n. 5 (3d Cir.1993). The federal requirement that the Pennsylvania agency retain ultimate responsibility for the transportation of disabled students makes this responsibility the exclusive province of the state. Moreover, Pennsylvania's undertaking to provide transportation services to Cynthia arose not from a "policy choice" but from a federal statutory requirement, which in the context of a contractual relationship, made BCIU's responsibility non-delegable. Because BCIU was responsible for Levy's compliance with federal statutory requirements, Levy functioned within Pennsylvania's system of federal compliance, satisfying the "sufficiently close nexus between the state and the challenged action of the regulated entity" necessary for "a finding of state action." *See Rendell-Baker,* 457 U.S. at 835-36 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).

*12 We now turn to the question of whether BCIU could have liability under § 1983 for a due process violation premised on a special custodial relationship. To make out such a claim, plaintiffs must prove that BCIU entered into a relationship with Cynthia that created an affirmative duty to protect her and that it subsequently breached that duty through deliberately indifferent conduct. *D.R.,* 972 F.2d at 1369-70. Specifically, plaintiffs must allege facts that would support a finding that 1) through its affirmative conduct, BCIU placed Cynthia in a custodial environment or otherwise restrained her personal liberty, *DeShaney,* 489 U.S. at 190; 2) BCIU then left Cynthia without a reasonable means of self-protection, *Id.;* 3) BCIU knew or should have known of the risk to Cynthia, *Nicini,* 212 F.3d at 815; and 4) BCIU failed to protect her under circumstances demonstrating deliberate indifference. *Id.*

In *D.R.* and *Black* respectively, the third circuit held that students in a public school building and students on a private school bus under contract to the school district were not in a special relationship with the state because they were not in custody within the meaning of *DeShaney. D.R.,* 972 F.2d 1371; *Black* 985 F.2d at 713-14. In *D.R.,* the court held that the children were at liberty to help themselves or to seek the assistance of their parents. 972 F.2d at 1373. Similarly, *Black* held that parents retained ultimate control over their children and were free to make other transportation arrangements or to escort the children to school personally. 985 F.2d at 714. Subsequently, in *Nicini,* the third circuit held that when the state places a child in state-regulated foster care, it enters into a special relationship with that child which imposes upon it certain affirmative duties, because foster children, like the incarcerated or the involuntarily committed, are thereby placed in a custodial environment and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d   Page 10

Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177

**(Cite as: 2002 WL 109615 (E.D.Pa.))**

are unable to seek alternative living arrangements. 212 F.3d at 808.

BCIU took affirmative steps, pursuant to its federally mandated "child-find duty," when it identified and placed Cynthia in LifePath school and arranged with Levy for her school transportation. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,* 172 F.3d 238, 253 (3d Cir.1999) (school's failure to notify parents of its IDEA duties could violate § 504 which imposes a "child find" duty, or the duty to identify a disabled child "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability"). Unlike the minor children in *D.R.,* Cynthia Susavage lacked the capacity to help herself once she was restrained by the harness that secured her to the bus seat. While the parents in *Black* could have arranged for alternate transportation for their non-handicapped children, Cynthia's physical handicaps, educational placement, and special transportation needs could be viewed as giving her parents a statutory right to rely on BCIU, through Levy, as the only reasonable means of transporting their child safely to a meaningful public school educational opportunity. Moreover, Cynthia's parents were caring at home for her sister who suffered from the same seizure disorder. *See Alamo Heights Independent School Dist. v. State Bd. of Educ.,* 790 F.2d 1153, 1155 (5th Cir.1986) (finding that disabled student's parents worked and consequently there was no alternate means of transportation and requiring that school district provide one-mile out-of-district transportation for disabled child so that his working mother could rely on a custodian to care for the child until the mother could pick him up). Thus, a reasonable jury could find that BCIU, through Levy, elected to physically restrain Cynthia's personal liberty on the bus, giving her no reasonable means of self-protection and thus triggering an affirmative constitutional duty to protect her during the transport. Therefore, the facts of this case fall into the category of the custodial condition recognized in *Nicini.*

*13 BCIU's liability would then turn upon whether it failed to protect Cynthia as a result of deliberate indifference. *Nicini,* 212 F.3d at 809. In *Nicini,* the court found that a caseworker's failure to investigate adequately a foster home did not rise to the level of deliberate indifference because the caseworker did not know or have reason to suspect the danger posed by the placement. *Id.* at 815; *see Black,* 985 F.2d at 711-12 (deliberate indifference would require evidence that school superintendent had failed to take reasonable measures to address complaints of sexual abuse of students); *Stoneking v. Bradford Area School District,* 882 F.2d 720, 725 (3d Cir.1989), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990) (high school principal and assistant principal could be held liable based on evidence that they were recklessly indifferent to instances of "known or suspected sexual abuse of students by teachers"); *White v. Chambliss,* 112 F.3d 731, 737 (4th Cir.1997) (liability if defendant was "plainly placed on notice of a danger and chose to ignore the danger"); *Doe v. New York City Dep't of Soc. Servs.,* 649 F.2d 134, 145 (2d Cir.1981) (deliberate indifference requires "some knowledge triggering an affirmative duty to act.... Defendants may be held liable [for] ... deliberate indifference to a known injury, a known risk, or a specific duty").

Here, both Levy and BCIU had direct knowledge of Cynthia's physical inability to sit upright in a bus seat or ride the bus unattended so as to protect herself from injury during the normal operation of the school bus. They also knew that she would be transported using a BCIU harness for which she had not been evaluated and which had not been certified by any certifying authority as being safe for the intended use. BCIU had never trained Levy in the use, non-use, or the application of the harness so as to discharge BCIU's statutory duty to satisfy itself that Levy and its bus drivers were expert in the use of harnesses provided as safety devices.

*14 It is also undisputed that the harness actually used was intended as an interim measure pending arrival of an appropriate car seat, that no assistant was provided to ride on the bus with Cynthia, and that no attempt was made to test the harness on Cynthia on the bus prior to December 11. Based on the facts as pled, a reasonable jury could find that the likelihood of injury of the type suffered by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 11

Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
(Cite as: 2002 WL 109615 (E.D.Pa.))

child was foreseeable and that under all of the circumstances, BCIU's action or inaction was deliberately indifferent to foreseeable consequences.

*d. Fourth Theory: State-created Danger*

BCIU asserts that the state-created danger theory is inapplicable in this case because the third circuit limited the applicability of this theory to municipalities in civil rights cases in *Morse v. Lower Merion School District*, 132 F.3d 902, 908 (3d Cir.1997). Plaintiffs respond that *Morse* did not limit the applicability of the state-created danger theory to municipalities, but addressed only the limits of foreseeability under that doctrine. Plaintiffs' position is well-taken.

The state-created danger theory allows a plaintiff to recover under § 1983 when, under certain circumstances, a state actor creates a danger that causes harm to an individual. See *Morse*, 132 F.3d at 907. The third circuit, in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir.1996), adopted a four-part test which holds a state actor liable if: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; and (4) the state actors used their authority to create an opportunity that otherwise would not have existed for harm to occur. *Kneipp*, 95 F.3d at 1208; see *Morse*, 132 F.3d at 910, n. 10 (quoting W. Page Keeton et al., Prosser & Keeton on Torts § 34 at 212-214 (5th ed. 1984) (The term "willful" indifference is somewhat misleading, requiring not an intent to harm, but a failure to act appropriately in light of a known or obvious risk. The 'willful' requirement, therefore, breaks down and receives at best lip service, where it is clear from the facts that the defendant, whatever his state of mind, has proceeded in disregard of a high and excessive degree of danger, either known to him or apparent to a reasonable person in his position")).

*Morse* did not limit the applicability of the state-created danger theory to municipalities. There, a school district leased classroom space to a daycare operator who allowed construction workers to use the unlocked back entrance for access to the building. A third party gained entrance to the building through the unlocked door and killed a teacher. *Morse*, 132 F.3d at 904. *Morse* held that, as a matter of law, the school district and the day care operator could not be held to have acted with willful disregard or deliberate indifference to safety, absent an allegation that defendants knew of the threat posed by the third party. *Id.* at 908. Thus, *Morse* found that the harm that ultimately befell the decedent was too attenuated from the defendants' actions to support liability because 1) the complaint did not allege that defendants were aware of the third party's violent propensities; 2) there were no allegations that the third party had made threats against the teacher or against anyone else at the school; and 3) there were no allegations that the third party had a history of violent behavior. *Id.*

*15 Based on the facts pled in this case, however, a jury could find that the risk of the kind of serious harm to Cynthia that actually occurred was known to exist, given her condition and the special warnings given to BCIU about the delicacy of any bus transportation attempted. Moreover, a jury could find that the injury was the *direct* result of the type of harness utilized, the way in which it was applied, or the choice that she be transported unattended. The fact that BCIU accepted responsibility for transporting the child satisfies the third *Kneipp* relationship prong. Because BCIU was aware of Cynthia's medical condition which prevented her from sitting upright or riding unattended, failure to insure a safe transport system for Cynthia prior to subjecting her to the risk of foreseeable serious injury could be viewed as a "failure to act appropriately in light of known or obvious risk," that is, deliberate indifference.

Finally, a jury could find that through the act of placing Cynthia in a harness for which she had not been adequately evaluated and then leaving her unsupervised during the bus transport, BCIU created an opportunity that would not otherwise have existed for the child to suffer strangulation.

*C. Section 1983 Claim based on violation of parents' due process rights*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 12

Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177

(Cite as: 2002 WL 109615 (E.D.Pa.))

The facts as pled do state a cause of action for violation of Fourteenth Amendment due process rights of the parents. A parent's rights of companionship and association with the children are substantive due process rights for which termination damages may be awarded. *Agresta v. Sambor*, 687 F.Supp. 162, 167 (E.D.Pa.1988) (parents could seek civil rights damages for termination of parental relationship with married, adult child as a result of child's death), *aff'd mem.*, 993 F.2d 223 (3d Cir.1993). Cynthia's parents have alleged sufficiently that as a result of BCIU and the named defendants' violations of Cynthia's rights under IDEA, the ADA and § 504, they have been deprived of protected substantive due process rights to companionship and association with their daughter.

*D. Monetary Damages for Violations of IDEA, ADA and § 504*

*16 BCIU argues that the complaint is fundamentally flawed because none of these statutes confers a right to recover damages for physical injuries resulting from negligent conduct. It states that § 504 and the ADA are anti-discrimination statutes requiring intentional discrimination and that plaintiffs have not alleged that the child was intentionally discriminated against due to her disability. BCIU asserts that it complied with statutory requirements by designing an appropriate IEP for Cynthia Susavage. In addition, BCIU argues, IDEA is an educational statute which ensures that children with disabilities receive a free appropriate public education, and also creates no private right of action for physical injuries. The court agrees with BCIU in substantial part.

In *W.B. v. Matula*, 67 F.3d 484 (3d Cir.1995), the court addressed these issues in the context of a mother's action, on behalf of her disabled child, seeking damages for the persistent refusal of certain school officials to evaluate, classify, and provide necessary educational services. *Id.* at 496. The court first observed that where statutory rights are at issue, a private right of action is impermissible if "Congress intended to foreclose such private enforcement." *Id.* at 493 (quoting *Wright v. Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)). It then acknowledged that in *Smith v. Robinson*, 468 U.S. 992, 1012-13, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), the Supreme Court had found IDEA administrative procedures to be the exclusive means for enforcing the rights of disabled children when IDEA, § 504, and constitutional equal protection claims overlapped. *Id.* Following an extensive review of legislative history, however, the third circuit found that in response to *Smith*, Congress specifically amended the statute "to add 20 U.S.C. § 1415(f) which establishes that the statute's provisions are not the sole means for redress" of violations. *Matula*, 67 F.3d at 493-94; *see* The Handicapped Children's Protection Act of 1986, Pub.L. No. 99-372 § 3, 100 Stat. 796 (1986).

Concluding that the "traditional presumption in favor of all appropriate relief," had not been rebutted, the court specifically held that "plaintiffs may seek monetary damages directly under § 504, as well as the § 1983 claim predicated on § 504." *Matula*, 67 F.3d at 494 (quoting *Franklin v. Gwinnet County Pub. Sch.*, 503 U.S. 60 66, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)).

Similarly, upon consideration of the legislative history of IDEA, the court held that an action for monetary damages could be brought under § 1983 based on violations of IDEA and further, that "the expansive language of § 1415(f)," which "tracks the broad grant of remedial power allowed a district court reviewing a direct IDEA appeal, *see* 20 U.S.C. § 1415(e)(2), contains no restrictions on forms of relief" under the statute. *Matula*, 67 F.3d at 494.

Based on the reasoning in *Matula*, the third circuit subsequently held that monetary damages are also available under the ADA. *Jeremy H.*, 95 F.3d at 279 . The court noted that under 42 U.S.C. § 12133, "the remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title." *Id.* (quoting 42 U.S.C. § 12133 (1995)). 29 U.S.C. §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 13
Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
**(Cite as: 2002 WL 109615 (E.D.Pa.))**

794a is the provision that governs remedies for violations of § 504. *Jeremy H.*, 95 F.3d at 279. Since *Matula* had already found that this provision permitted claims for monetary damages, *see* 67 F.3d at 494, "it follow[ed] that those claims [were] also permitted under the ADA." *Jeremy H.*, 95 F.3d at 279.

*17 Thus, if plaintiffs state a cause of action under each of the statutes, they will not be precluded from seeking damages directly under each statute as well as in § 1983 actions predicated on the statutory violations for deprivation of opportunities which she was competent to receive and enjoy.

It is important to note, however, that while *Matula* did not preclude the award of monetary damages for violations of statutory rights, leaving "to the district courts in the first instance the task of fashioning appropriate relief", the third circuit "caution[ed]" that in so doing, "a district court may wish to order educational services such as compensatory education beyond a child's age of eligibility, or reimbursement for providing at private expense what should have been offered by the school, rather than compensatory damages for generalized pain and suffering." *Matula*, 67 F.3d at 495 (citing *Jackson v. Franklin County School Bd.*, 806 F.2d 623, 632 (5th Cir.1986) (stating that in a § 1983 action alleging IDEA violations, "remedial educational services may be more valuable than any pecuniary damages that could be awarded")); *see Ridgewood*, 172 F.3d at 250 (an award of compensatory education under IDEA is not precluded for years in which a disabled student received an inappropriate education; rather, a disabled student's right to compensatory education accrues when the school knows or should know that its IEP is not providing an appropriate education).

Because appropriate relief should foster legislative goals, i.e., to provide Cynthia with a free and appropriate education, and because a compensatory education award can not now further that goal, a district court fashioning a remedy for violation of Cynthia's rights pursuant to IDEA, the ADA and § 504-- either in direct actions or under § 1983 --would need to determine the value of the educational services denied to the child from the time the defendant knew or should have known she was receiving an inappropriate education until the time of her incapacity. She would not be entitled to an award for any period of time after December 11, 1998, because she was then comatose.

For the reasons that follow, the court finds that the facts as pled state causes of action under IDEA, the ADA, and § 504 for educational deprivations up to the time of the decedent's strangulation.

1. IDEA Claim

*18 The facts as pled state a cause of action for violation of IDEA which was passed "to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c). Such an education "consists of educational instruction ..., supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Board of Education v. Rowley*, 458 U.S. 176, 188-89, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). "The term 'related services' means transportation ... and other supportive services ... as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(22). The term 'assistive technology service' includes, *inter alia*, "selecting, designing, fitting, customizing, adapting, applying, maintaining, repairing, or replacing of assistive technology devices," 20 U.S.C. § 1401(26)(C), as well as "training or technical assistance for professionals ... or other individuals who provide services to ... or are otherwise substantially involved in the major life functions of individuals with disabilities." 20 U.S.C. § 1401(26)(F).

Plaintiffs have alleged that Cynthia was subject to discrimination and was denied benefits, i.e., a free and appropriate education with necessary related services, including adequate transportation. Specifically, it is not disputed that the BCIU provided the harness used on Cynthia Susavage and that it did not provide training on the correct use or adaptation of the device. While BCIU asserts that it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 14
Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
(Cite as: 2002 WL 109615 (E.D.Pa.))

complied with IDEA requirements by developing an IEP for Cynthia, *Ridgewood,* 172 F.3d at 250, held that "IDEA's central goal is that disabled students receive an appropriate education, not merely an appropriate IEP." Thus, "denial of an appropriate education ... creates the right to compensatory education." *Id.* Moreover, plaintiffs have asserted both that 1) the IEP developed for Cynthia was inadequate because it provided no instructions to Levy on how to transport Cynthia safely, and 2) the harness in question was a makeshift device using straps from different harnesses to secure it to the bus seat, which additionally was put on backwards with the zippers in front, against the child's neck. In the instant case, if either BCIU failed to provide adequate transportation services to Cynthia Susavage as required by the IEP which BCIU itself created; or, if the IEP itself was inadequate, plaintiffs would have a valid claim under IDEA.

2. Section 504 Claim

The facts as pled state a cause of action for violation of § 504. While IDEA sets forth a positive right to a "free appropriate public education," § 504 bars all federally funded entities (governmental or otherwise) from discriminating on the basis of disability. *Matula,* 67 F.3d at 492. "There appear to be few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition." *Jeremy H.,* 95 F.3d at 278-79 (quoting *Matula,* 67 F.3d at 492-93). To establish a violation of § 504, plaintiffs must demonstrate that (1) Cynthia was disabled as defined by the Act; (2) that she was "otherwise qualified" to participate in school activities; (3) that the school or the Board receives federal financial assistance; and (4) that Cynthia was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir.1991); 34 C.F.R. § 104.4(a).

In addition, to be liable, defendants "must know or be reasonably expected to know of" the child's disability. *Nathanson,* 926 F.2d at 1381. However, plaintiffs "need not establish that there has been an intent to discriminate in order to prevail under §

504." *Id.* at 1384. They "may circumstantially allege that [Cynthia] was discriminated against ... by alleging facts that could be interpreted to show 'bad faith or gross misjudgment.'" *McKellar v. Commonwealth of Pennsylvania Dep't of Educ.,* No. 98-cv-4161, 1999 WL 124381, at *5 (E.D.Pa. February 23, 1999).

*19 The first three prongs of the *Nathanson* test are clearly met. It is also undisputed that BCIU had identified Cynthia as a disabled child. Moreover, if believed, plaintiffs assertions that Cynthia's IEP did not provide guidance to Levy for her safe transportation and that she was caused to ride the school bus unattended, could be found to have effectively excluded her from participating in or receiving an equal educational opportunity at the LifePath school.

3. ADA Claim

The facts as pled state a cause of action for violation of the ADA when they assert that defendants failed to comprehensively evaluate Cynthia's specific needs and to provide tailored appropriate special education and related services, namely travel training and an appropriate seating restraint system. Section 12132 extends the nondiscrimination rule of § 504 to services provided by any "public entity" (without regard to whether the entity is a recipient of federal funds), *see Helen L.,* 46 F.3d at 331-32, when it states that "no qualified individual with a disability shall by reason of such disability be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (1995). Like § 504 claims, ADA claims can be based on the discriminatory effect on disabled children of seemingly neutral practices and do not require a finding of intentional discrimination. *Helen L.,* 46 F.3d at 335 ("'affirmative animus'... was not the focus of the ADA or section 504"); *see McKellar,* 1999 WL 124381, *5 (inferential allegation that defendant school district did not comply with an IEP due to a minor plaintiff's disability was sufficient to sustain an ADA claim).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 15

Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
**(Cite as: 2002 WL 109615 (E.D.Pa.))**

4. Exhaustion of Administrative Remedies under IDEA, ADA and § 504

BCIU asserts that this court lacks jurisdiction to decide plaintiffs' claims under IDEA because plaintiffs have failed to exhaust administrative remedies as required by *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984).

However, there is no exhaustion requirement under Title II of the ADA or under the Rehabilitation Act, *Freed v. Consolidated Rail Corp.,* 201 F.3d 188, 194 (3d Cir.2000), and IDEA's exhaustion requirement is waived where such proceedings would be futile. *Honig v. Doe,* 484 U.S. 305, 326-27, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *Matula,* 67 F.3d at 496 (holding administrative proceedings were futile where relief sought was unavailable through IDEA administrative proceedings and allowing for "other very narrow exceptions permitting the exhaustion requirement to be waived before filing a § 1983 claim, such as where the parents of a deceased child seek damages for a school board's failure to provide IDEA services while the child was still alive").

This case involves precisely the type of narrow exception contemplated by the third circuit in *Matula.* The monetary relief sought by plaintiffs cannot be obtained through IDEA administrative proceedings. As such be futile, the exhaustion requirement is waived.

5. Delegation of Duty under IDEA, ADA and § 504

*20 This court has already found that BCIU's argument that it delegated its duty cannot absolve it of liability under the ADA, IDEA or § 504 in this case. BCIU was the public agency responsible for Pennsylvania's compliance with federal statutory requirements in the Quakertown School District and pursuant to federal law it cannot abdicate that responsibility by delegating it to a private entity. *See Fuhrmann,* 993 F.2d at 1037 n. 5.

*E. Section 1985 Conspiracy Claim*

BCIU argues that plaintiffs' claim under 42 U.S.C § 1985 is frivolous and the court agrees. The Supreme Court has held that § 1985(3) protects persons only from those conspiracies motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *see also Pratt v. Thornburgh,* 807 F.2d 355, 357 (3d Cir.1986), *cert. denied,* 484 U.S. 839, 108 S.Ct. 125, 98 L.Ed.2d 83 (1987). In order to state a claim under 42 U.S.C. § 1985(3), the plaintiff must allege "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons ... [of] the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Ridgewood,* 172 F.3d at 254 (quoting *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997). In *Lake,* the court held that the mentally retarded are a class protected by § 1985(3), but expressly declined to make a determination with respect to physically handicapped persons. *Lake,* 112 F.3d at 685-86 & n. 5. The court need not address the issue here since there is no assertion in the complaint that defendants' alleged deprivation of Cynthia's rights was based on class-based animus. The claim is therefore dismissed with prejudice.

*F. Other Alleged Deficiencies in the Complaint*

1. Punitive Damages

BCIU argues, and the court agrees, that plaintiffs may not seek punitive damages against BCIU under § 1983, the ADA, § 504 or IDEA. The third circuit recently held "that Title II of the ADA and Section 504 of the Rehabilitation Act lack any indicia of Congress' intent to override the settled common law immunity of municipalities from punitive damages." *Doe v. County of Centre,* 242 F.3d 437, 457 (3d Cir.2001). The court determined that *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (dismissing plaintiff's claim of punitive damages in action brought under § 1983 as against public policy), "should apply with equal force to suits under Title II of the ADA and under Section 504 of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d     Page 16

Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177

**(Cite as: 2002 WL 109615 (E.D.Pa.))**

Rehabilitation Act." *Doe,* 242 F.2d at 457.

Although the third circuit has not addressed the issue of punitive damages under IDEA, applying the reasoning in *Doe,* these are barred as well. While a number of district courts have concluded that "[f]or claims brought under the IDEA, punitive damages are available against municipal defendants," *Scott v. Bethlehem Area Sch. Dist.,* 2000 WL 1201345 at *5 (E.D.Pa. August 9, 2000); *J.F. & N.F. v. School District of Philadelphia,* No. Civ.A. 98-1793, 2000 WL 361866, at * 18 (E.D.Pa. Apr. 7, 2000), these decisions pre-date *Doe* and are now inapplicable. Finally, plaintiffs cannot obtain punitive damages against a municipality for violation of Fourteenth Amendment due process. While the third circuit has stated that punitive damages may be awarded based solely on a constitutional violation provided a proper showing is made, *see Allah v. Al-Hafeez,* 226 F.3d 247, 251 (3d Cir.2000) (citing *Alexander v. Riga,* 208 F.3d 419, 430 (3d Cir.2000); *Basista v. Weir,* 340 F.2d 74, 87 (3d Cir.1965)), these cases do not specifically address the liability of municipalities. *Allah* upheld a § 1983 claim for punitive damages based on an alleged violation of First Amendment freedom of religion against a prison chaplain. 226 F.3d at 251-52. Similarly, *Alexander* upheld a punitive damages claim against a landlord for violation of the Fair Housing Act. 208 F.3d at 433-34. In *Basista,* the court determined that an award of punitive damages could be sustained against an individual police officer for deprivation of personal liberty based on illegal arrest and wrongful incarceration stemming from the officer's personal animosity toward the plaintiff. 340 F.2d at 80-81. None of these cases refutes the proposition that punitive damage awards against municipalities are against public policy because they " 'punish[ ]' only the taxpayers, who took no part in the commission of the tort." *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 267, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

2. Standing

*21 BCIU argues that the parents of a child may not seek damages in their own right for alleged violations of the child's rights. BCIU cites, *Collingsgru v. Palmyra Board of Education,* 161 F.3d 225 (3d Cir.1998), where the court rejected an independent IDEA claim by a minor's parents under a "joint rights theory" based on their legal responsibility for their child's education. Moreover, BCIU argues that the rights to be enforced in a federal civil rights action are "personal" to the injured party.

Parents may not assert a cause of action in their own right for alleged violations of their child's rights under IDEA because they are not real parties in interest under the statute. *Collingsgru,* 161 F.3d at 236-37. The third circuit rejected the argument that IDEA created the same rights in parents/plaintiffs that it created in their son or that the son's complaint was functionally their own and held that "Congress's decision to endow parents with ... procedural rights should not be read, under the language of the IDEA, to imply that parents also possess the same underlying substantive rights that their children possess." *Id.* at 227. While plaintiffs cite *Matula,* 67 F.3d at 496 and *Jeremy H.,* 95 F.3d at 272 for the proposition that parents are permitted to pursue the rights of their handicapped children under § 1983, IDEA and § 504, these cases merely establish that parents may pursue *their children's* rights. They do not recognize substantive rights in the parents themselves. Thus, plaintiffs have standing to bring Cynthia's claims but they lack standing to sue in their own right under each of the federal statutes.

3. Statute of Limitations

*22 BCIU argues that plaintiffs' claims are time-barred because the federal statutes involved in this matter all have two-year statute of limitations periods. The complaint was filed December 8, 2000. BCIU asserts that no alleged act or omission by BCIU took place on or after December 8, 1998 and that plaintiffs cannot recover for alleged acts or omissions that occurred before December 8, 1998, more than two years before their complaint was filed.

The claims in the instant case are not time-barred. The IDEA, § 504, the ADA and § 1983 do not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 17

Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
(Cite as: 2002 WL 109615 (E.D.Pa.))

contain statute of limitations provisions. However, implicit statutes of limitations exist by reference to underlying state law. *Wilson v. Garcia,* 471 U.S. 261, 266-67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Because discrimination cases use the personal injury claim statute of limitation, *see, e.g., Goodman v. Lukens Steel Co.,* 482 U.S. 656, 662, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), the applicable limitation in this case is two years. 42 Pa.C.S. § 5524; *see also Tokarcik v. Forest Hills Sch. Dist.,* 665 F.2d 443, 454-55 (3d Cir.1981) (applying two year limitation to IDEA); *Carver v. Foerster,* 102 F.3d 96, 101 n. 3 (3d Cir.1996) (same as to § 1983); *Toney v. U.S. Healthcare, Inc.,* 840 F.Supp. 357, 360 (E.D.Pa.1993), *aff'd,* 37 F.3d 1489 (3d Cir.1994) (same as to § 504); *DeAngelis v. Widener University Sch. of Law,* No. 97-6254, 1998 WL 54333, at *2 (E.D.Pa. Jan. 13, 1998) (same as to ADA).

In *Ridgewood,* the third circuit, reiterating its holding in *Jeremy H.,* stated that the limitations period for IDEA actions begins to run "once the state administrative process has run its course." *Ridgewood,* 172 F.3d at 250 (quoting *Jeremy H.,* 95 F.3d at 280). The court thus specifically rejected the argument that all compensatory education claims involving events that occurred more than two years before the action was brought were time-barred. *Id.* Here, it is clear that the state administrative process had not run its course at the time of Cynthia's death. Even BCIU itself pointed out that plaintiffs had not exhausted administrative remedies. Nevertheless, upon Cynthia's death, the exhaustion requirement was waived because further proceedings would have been futile. The IDEA administrative proceedings became futile upon Cynthia's death and the statute of limitations for a complaint in this court began to run on September 25, 1999.

Moreover, the third circuit recently stated that when we borrow state limitations periods for use in federal civil rights cases, "[w]e must also incorporate any relevant state tolling rules." *Lake v. Arnold,* 232 F.3d 360 (3d Cir.2000) (citing *Hardin v. Straub,* 490 U.S. 536, 543-44, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989) (holding that "[l]imitations periods in § 1983 suits are to be determined by reference to the appropriate state statute of limitations and state tolling rules as long as the law is not inconsistent with federal law)); *Board of Regents, Univ. of N.Y. v. Tomanio,* 446 U.S. 478, 484-85, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980) (holding that when Congress does not establish a statute of limitations or a body of tolling rules applicable to federal-court actions, the analogous state statute of limitations and the coordinate tolling rules are binding rules of law in most cases). Thus, in *Lake,* the third circuit explicitly held that "for § 1983 and § 1985 actions originating in Pennsylvania, we look to 42 Pa.C.S. §§ 5524 and 5533." *Lake,* 232 F.3d at 368.

Under 42 Pa.C.S. § 5533(b), the statute of limitations does not start to run against a potential plaintiff until the age of 18. *Fancsali ex rel. Fancsali v. University Health Center of Pittsburgh,* 563 Pa. 439, 761 A.2d 1159, 1164 (Pa.2000); 42 Pa.C.S.A. § 5533(b) ("If an individual entitled to bring a civil action is an unemancipated minor at the time the cause of action accrues, the period of minority shall not be deemed a portion of the time period within which the action must be commenced").

*23 At the time of her death, Cynthia Susavage was a minor. Prior to her death, Cynthia's claims would automatically have been tolled by the minority tolling statute regardless of when they accrued. The purpose of the minority tolling statute is to give a minor an equal opportunity to bring a cause of action. *Foti v. Askinas,* 432 Pa.Super. 604, 639 A.2d 807, 809 (Pa.Super.1994). Upon her death the statute's goal of allowing her to bring a cause of action upon achieving majority, was no longer viable and the statute of limitations began to run.

While § 5533(b) has been held not to toll the statute of limitations for a parent's derivative claims, *Hathi v. Krewstown Park Apartments,* 385 Pa.Super. 613, 561 A.2d 1261, 1262-63 (Pa.Super.1989), plaintiffs' claim for loss of companionship and association survives the motion to dismiss. Cynthia's injury occurred on December 11, 1998 and the complaint was filed less than two years later on December 8, 2000. Contrary to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 18
Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177
**(Cite as: 2002 WL 109615 (E.D.Pa.))**

BCIU's assertion that no act or omission by it took place between December 8, 1998 and December 11, 1998, plaintiffs have specifically alleged that on December 10, 1998, a Levy bus driver noted that a seatbelt did not secure Cynthia properly on the bus because she was unable to stay in a sitting position and was advised by Dr. Newcomer of the school district, that there were three options: 1) put an aide on the bus to ride with Cynthia; 2) get a special car seat for her; or, 3) put a harness on her. Plaintiffs have alleged that on the same day, Dr. Newcomer decided to try the harness and that Marcy Woods of BCIU approved his suggestion. It is further alleged that Mr. Jones of Levy, then went to the Susavage home with three harnesses provided by BCIU and one was chosen for Cynthia. Finally, it is undisputed that on December 11, 1998, Cynthia was put in the harness and was strangulated on the bus ride to school.

If found to be true, these facts caused the death of Cynthia Susavage on September 25, 1999 such that plaintiffs' cause of action for termination of their parental relationship did not begin to run until that date. *See Agresta,* 687 F.Supp. at 167 (holding parents could seek civil rights damages for termination of parental relationship with married, adult child as a result of child's death at the hands of police), *aff'd mem.,* 993 F.2d 223 (3d Cir.1993).

*G. BCIU's Motion for a More Definite Statement*

*24 BCIU moves for a more definite statement, pursuant to Fed.R.Civ.P. 8(a) and 10(b), stating that plaintiffs intermingle their legal theories in each of the four counts and engage in "group" pleading by failing to particularize which defendants violated which statutes at which times. Under Fed.R.Civ.P. 8, a pleader will be required to separately state and number his claims when that procedure will facilitate a clear presentation of the matters set forth and a proper disposition of the issues. Similarly, Fed.R.Civ.P. 10(b) provides that claims or defenses should be made in numbered paragraphs, limited as far as practicable to a statement of a single set of circumstances. The purpose of this separation is to "facilitate[ ] the clear presentation of the matters set forth." *Id.*

The court concludes that BCIU can well discern the plaintiffs' claims given the specific allegations of the complaint and the many pages of both the motion to dismiss and the response.

*IV. CONCLUSION*

For the foregoing reasons, defendant BCIU's motion to dismiss is granted in part and denied in part. The motion for a more definite statement is denied. An appropriate order follows.

*ORDER*

AND NOW, this ___ day of January, 2002, upon consideration of Defendant Bucks County Intermediate Unit No. 22's Motion to Dismiss Plaintiff's Complaint Pursuant to Fed.R.Civ.P. 12(b)(6), or in the alternative, for a more definite statement pursuant to Fed.R.Civ.P. 8(a) and 10(b), and the arguments of the parties, it is hereby ORDERED as follows:

1. The Motion to Dismiss is GRANTED as to all claims under 42 U.S.C. § 1985 and these are DISMISSED WITH PREJUDICE.

2. The Motion to Dismiss is GRANTED as to plaintiffs' claims in their own right for violation of their daughter's rights under the Individuals with Disabilities Education Act ("IDEA"), 2 U.S.C. § 1400, *et. seq..*

3. The Motion to Dismiss is GRANTED as to plaintiffs' claims in their own right for violation of their daughter's rights under § 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794.

4. The Motion to Dismiss is GRANTED as to plaintiffs' claims in their own right for violation of their daughter's rights under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq.*

5. The Motion to Dismiss is GRANTED as to plaintiffs' claims in their own right for violation of their daughter's due process rights under the Fourteenth Amendment to the United States Constitution.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 19

Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177

**(Cite as: 2002 WL 109615 (E.D.Pa.))**

6. The Motion to Dismiss is GRANTED as to all claims for punitive damages against Defendant BCIU.

7. The Motion to Dismiss is DENIED as to plaintiffs' claims in their own right under 42 U.S.C. § 1983 for violation of their due process rights under the Fourteenth Amendment to the United States Constitution for termination of the parental relationship.

8. The Motion to Dismiss is DENIED as to plaintiffs' claims as Administrators of the Estate of Cynthia Susavage for violation of the decedent's rights under the Individuals with Disabilities Education Act ("IDEA"), 2 U.S.C. § 1400, et. seq. and the 42 U.S.C. § 1983 action predicated thereon.

9. The Motion to Dismiss is DENIED as to plaintiffs' claims as Administrators of the Estate of Cynthia Susavage for violation of the decedent's rights under § 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794 and the 42 U.S.C. § 1983 action predicated thereon.

*25 10. The Motion to Dismiss is DENIED as to plaintiffs' claims as Administrators of the Estate of Cynthia Susavage for violation of the decedent's rights under the Americans with Disabilities Act, 42 U.S.C. § 12101, et. seq. and the 42 U.S.C. § 1983 action predicated thereon.

11. The Motion to Dismiss is DENIED as to plaintiffs' claims under 42 U.S.C. § 1983 as Administrators of the Estate of Cynthia Susavage for violation of the decedent's due process rights under the Fourteenth Amendment to the United States Constitution.

12. The Motion for a More Definite Statement is DENIED.

Not Reported in F.Supp.2d, 2002 WL 109615 (E.D.Pa.), 22 NDLR P 177

**Motions, Pleadings and Filings (Back to top)**

• 2:00CV06217 (Docket) (Dec. 08, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.